17-0-1-6-1. In Randy Estate of William K. Kelso, deceased, Sharon Kelso, Individually Unaccessible. Dictator of the Estate, Appellate, Cross-Appellant by Jeffrey DeJude vs. Richard Burkey, Appellant slash Cross-Appellant by Gino Monti. Mr. DeJude? We've got the wrong case here. Which? That's the correct case. Okay, I've just got it. I've just got it. Oh, Cross-Appellant. My name is Mr. Norton. Okay, my bad. As I said, you've grown since we last met. May it please the Court, Counsel? My name is Gino Norton, and I represent the Defendant Appellant, Richard Burkey. Mr. Burkey is an attorney, and this involves a fee agreement in a case that he represented the Kelsos in. It emanated from a tragic accident that happened where Mr. and Mrs. Kelso were traveling in a vehicle, and they were struck by another vehicle. Subsequently, Mr. Kelso passed away, and Mrs. Kelso suffered some significant injuries as well. The injury happened in February of 2011. Mr. Burkey was originally engaged on March 21st of 2011 to represent the Kelsos in a contingent fee agreement, wherein he would represent them against the driver of one of the vehicles, the driver of another vehicle, Nowicki and Porth, and or any other persons or entities responsible for their injuries. He undertook collecting the information. The contingent fee agreement was a standard one-third contingent fee agreement, and he started collecting evidence, and he soon learned that the policy of insurance that he made toward Feezer, Ms. Nowicki had, was a policy that was a 15,000, one-person, 30,000 limit policy. He also did some investigation as to any other sources of recovery, whether it be another driver, the road conditions, medical negligence, a car defect, and found that the only other avenue for recovery was the underinsured motorist policy that the Kelsos had. It was an auto owner's policy that was a single-limit $1 million policy. Mr. Burkey pursued the Nowicki claim, and because there were other claimants besides the Kelsos, that being people that were in Ms. Nowicki's car and in a third car, he was unable to collect the full $30,000 that was available because the insurance company for Ms. Nowicki was unwilling to part with those while other claims were pending. They suggested an interpleader. In the meantime, he was also negotiating and sending the necessary proofs to auto owners for the $1 million underinsured motorist coverage policy. And he began negotiating with auto owners for that policy. What was the negotiation? He had a death, and he said, what was the negotiation? It was only $1 million. They were going to pay it. Well, they don't have to pay it. It wasn't an insurance policy. It wasn't a life insurance policy. It was an auto policy. And just like any other auto claim, you have proofs. You have to prove your claim. You have to show that there was responsibility for the other driver, approximate cause, and injury. And Monica Stewart, who was the adjuster for auto owners, testified at a trial, and she testified she treats this claim just like any other accident claim, that the same requirements of proof are necessary before she'll pay out. The fact that someone has a policy of insurance in place for whether it be $20,000, $30,000, $100,000, $1 million, $2 million, they don't automatically pay out. There's a requirement that you have to prove it and negotiate it. That's borne out by the fact that in testimony, Mrs. Stewart, the adjuster for auto owners, did not immediately turn the policy over. It took proofs. Mr. Boyke had to collect income taxes. He had to collect the medicals. He had to send the medicals. He made two demands upon Mrs. Stewart for the policy, and they were met with nothing happened. It wasn't until he made a time limit demand on Mrs. Stewart that auto owners eventually decided in May of 2012 to pay the policy. In the meantime, before releases were sent out, Mr. Boyke began negotiating with Medicare to see what he could do as far as reducing or adjudicating the liens that Medicare had. He eventually was able to adjudicate the lien of Mr. Kelso down to zero, and releases were sent out. The release was signed by Mrs. Kelso on September 14th of 2012. The check from auto owners was dated September 27th of 2012, and in that period of time, after the release was signed and the check was on its way, Mrs. Kelso claims that she fired Mr. Boyke and that he was not entitled to any fee. Well, he had negotiated the full million dollars, it was really $970,000, but the full limit of the policy was negotiated, and the check was sent for the $970,000. It wasn't until after he had accomplished what he intended to do that she said, we're not going to pay you. And then she, about a month later, filed suit, and there was extensive litigation in this suit. We ultimately did a three-day trial. Judge Clark found that one of the issues was whether or not there was a contingent fee contract. Judge Clark found that there was a contingent fee contract, and it was clear and unambiguous. He did an assessment of the fees that should be paid, and it was his opinion that Boyke didn't have to do a lot of work to accomplish this. But this was a contract. It was a contract between Boyke and the Kelsos. Mrs. Kelso testified, and it was clear that she knew what she was doing. She was a competent adult, and she was actually a very sophisticated business person. She knew what she got into when she agreed to the one-third fee. Let me ask you this. Who wrote the contract? Mr. Boyke did. Okay. Do you think any reasonable person would say, go after the people responsible for my injuries, meaning go after my insurer that I've been paying premiums to if there's an underinsured loss here? Is auto owners responsible for their injuries? Yes. How did the auto owners cause any injuries? Auto owners didn't cause any injuries, but by way of their contract of insurance, they assumed a legal responsibility for any injuries that were suffered by the Kelsos, and they had to pay a sum based upon what those injuries were. But the contingency contract said, you'll go after the people responsible for my injuries. Wouldn't a person normally think they're talking about these torque teasers, you know, drivers, if there's a medical negligence or something like that? They're not talking about going after an insurance company. No, and it became pretty clear, it became abundantly clear in January of 2012 that Mrs. Kelso knew who Mr. Boyke was going after. Besides the letters that he sent to her saying this is what we're doing and who we're going after, all of those are in the record, he sent her a short authorization that she had to sign so that auto owners would deal with him as far as settling the estate of Mr. Kelso. And it said that she understood that, and she granted him the power to negotiate on her behalf for the settlement of the auto owner's insurance policy. So it's clear that she knew throughout the case, and even from the very beginning from her testimony, that auto owners was involved and Mr. Boyke was pursuing them on the contingency agreement. In any event, we could not find and the court did not cite to any cases that say that the court has a right to interfere with the contract here between the parties. And all of the case laws that we found upheld any adult contract in a contingency agreement case where someone was trying to knock it down. If we were to allow people to, at the 11th hour after a case has been settled, to dispute whether or not someone was entitled to a one-third fee, the floodgates would be open. Contingency agreements are in effect and allowed by the Supreme Court for a reason. The attorney undertakes a responsibility with no fee in the hopes that he can obtain a settlement or a judgment after trial for his client. Here, Mrs. Kelso, after the result that she wanted had been achieved, changed her mind and decided she didn't want to pay. If that were to happen in Illinois, the floodgates would be open. And any litigant who had achieved the settlement could simply say, I don't want to pay one-third. And that's exactly what she did here. Lawyers are reasonably smart fellows and ladies. How about putting in the contract for the people responsible and for any uninsured or underinsured motorist claims you might have against your insurance carrier? At the beginning, when these contracts are signed, we don't know how many different entities are possibly targets for the lawsuit. In this case, we had the Honorable Judge Simmons testify about contracts. He does the contracts for Robert Clifford's office in all their cases. And he says that you can't do that. And there's a reason you can't do that, because you don't know at the time of contracting who all the responsible entities are going to be. And that's why Mr. Boyke's contract said, and or any person or entity responsible for the injuries. And that encompasses all of those potential entities. Some of the cases that we found that deal with this, one of them was the SASS case. And that's the only one where we saw that was a case where a mom was in an auto accident. She was injured. She passed away. She had one child and she had a husband. The husband sued on her behalf for himself and for the child. The court, after reviewing the fee agreement, found that the child shouldn't have to pay a fee, but found that the one-third fee for the husband was reasonable. And that's what had been contracted for. In another case, the Doyle case, which is cited, and it was something that Judge Clark asked us to look at when we prepared our briefs in this case, that was one where it was a life insurance policy. And the only thing that the lawyers had to do in that case was to prepare a claim form and attach the death certificate. That was a case where there was $102,000, I don't know why it was an odd number, in life insurance, and the court upheld their fee of one-third. In this case, there was no reason for the judge to interject himself into what was an agreement between the parties. And based upon that, we ask that you find that the one-third fee that Mr. Boyke contracted for with Ms. Kelso was reasonable and fair. Thank you. Thank you, Mr. Doyle. Mr. Cagioti. Thank you, Your Honor. Good afternoon. Counsel? May it please the Court. I am Jeff Cagioti on behalf of Sharon Kelso, and thank you for the opportunity to speak before you today. I certainly appreciate that. She appreciates that as well. A couple of things in response to the argument before. The biggest thing and the biggest argument that we have is that Mr. Boyke did not fulfill the terms of his written contract. He did not do what he said he was going to do. He may have done what he intended to do, but he didn't do what he said he was going to do according to the terms of the contract that he drafted facts to and asked Mrs. Kelso to sign and return to him. There were two contracts. One that was signed in March of 2011. That was for Sharon Kelso for her injuries. There's been no recovery at all for Sharon Kelso on that contract. There was a second contract also faxed to her with a request that she sign it and send it back April, excuse me, signed April 13th of 2011. That one said that Mr. Boyke would prosecute a claim or cause of action against Shana Nowicki, Daniel Forth, and or other persons or entities responsible for the injuries sustained by William Kelso resulting in his death. That's what Sharon Kelso understood that Mr. Boyke was going to do. In conjunction with that, there was a one-third agreement that any recovery from Shana Nowicki, Daniel Forth, or anybody else responsible for the injuries, one-third of the recovery would be paid in attorney's fees. There was nothing said about auto owners. There was nothing said about your own insurance company. There was nothing said about any other cause of action or theory. And the reasonable person, which Sharon is, would read that and say, that has nothing to do with my insurance policy. She did know that Mr. Boyke was a friend of her son's. She did know that Mr. Boyke had to have medical records, had to have information, had to have police reports dealing with the accident, had to have all that information to represent her against Shana Nowicki or Daniel Forth or anybody else. She provided that information to him. She was told through communication between Boyke and her daughter that everything that was to go to auto owners would need to go through Mr. Boyke. She didn't know that his intention at that point was that he was going to be entitled to a third of it, a third of any recovery from her insurance company. Mr. Boyke did do some letters, did submit the information that the Kelso family provided to him, the information that was necessary for auto owners to look at the case and to consider whether it would and could and indeed did tender most of the insurance policy, $970,000. It kept back $30,000 because auto owners understood that there was $30,000 out there, perhaps from Shana Nowicki. That's never been recovered either. When Sharon Kelso found out through a telephone call to Boyke's office that he intended to keep one-third of the auto owner's insurance proceeds, she terminated all employment with him at that point. She didn't refuse to pay him. She refused to pay him one-third of $970,000. He did some work. He did shuffle the paper to auto owners to allow it to make a decision and to go ahead and pay $970,000. He's entitled to something for his time. We don't know what time he spent on it, though. No records were kept. He has no records. He has no time logs as far as what kind of time is to be spent on it. The trial court found that the contracts between Mr. Boyke and Mrs. Kelso were clear and unambiguous, and they would agree on that fact except the trial court and I separate when we look at the extent or the scope of the contracts that were signed. As Judge Schmidt had indicated, a reasonable person would read those contracts as pursuing a person that caused the injury, pursuing a person that caused the accident, pursuing a person that caused some injury, illness, sickness, damage to Mr. Kelso that resulted in his death. Auto owners didn't do that. Auto owners ensured that if there was insufficient coverage or insufficient assets held by a person that actually caused the damage, then auto owners would indemnify and pay the Kelsos. It did indeed pay the bill Kelso Estate $970,000, but the $970,000 was not the subject of those written contracts. It was a side matter. It was indeed a separate matter. We agree Mr. Boyke did do some work, but he's not entitled to one-third of the amount that auto owners paid. The trial court found that the contingency fee agreement covered the $970,000. Again, I don't believe that that is a correct reading of the contracts, but the trial court did take into account in its ruling the fact that it, the trial court has the power and the duty to pay attention to contingency fee agreements to determine whether a fee is reasonable. So in response to Mr. Boyke's appeal, the trial court does have the power to determine whether an attorney is entitled to full payment under a valid and applicable contingency fee agreement. The court had the discretion to make its decision the way it did if the contracts that were signed by Mrs. Kelso covered the auto owner's insurance. They didn't though. They didn't though. Mr. Boyke is entitled to quantum Merrill for the time that he spent and the efforts that he took. He's entitled to recover some sort of fee. We just don't know what that is. Case law in quantum Merrill and also rules professional conduct 1.5 basically give us seven or eight factors to consider when we're looking at a quantum Merrill case. The first one and perhaps the one that is the most important is how much time and effort was spent by the attorney in dealing with the case. Again, we don't know. No time records were kept. There was no evidence to indicate the amount of time. Under a contingency fee case, does it matter? Does it matter if he spent four years, two months, three days? It says that if a recovery, a settlement, or a verdict and we recover, you are entitled to your portions. Why do you think it's necessary for there to be time records? Well, the case law in quantum Merrill is pretty clear that that's very, very important. If it is a valid contingency fee case and the fee is reasonable for the circumstances, then it may not be necessary in every case. But the cases that have been cited and considered by the court, Doyle and Sass, considered seven factors and one of them is indeed the time spent. In fact, every contingency fee case that has been cited in the court or the trial court considered, the amount of time actually spent was indeed one of the factors in determining the reasonableness of the fee. All of those cases, as I read them, were all prior to, although close, but prior to a settlement having been reached. Correct. And here we have a settlement that's already completed. And, I mean, I know that you said that it's only for the purpose of a claim or cause of action against Nowicki or Porth. But, you know, when it says that Mr. Buick's office is going to prosecute a claim or cause of action, isn't making the claim to Nowicki and Porth's insurer finding out that there's no money, that's what leads you back to your own insurer? I mean, that's the process, right? To a certain extent. However, the understanding of the parties is really what controls the extent of the contract. And a reasonable person reading that would understand, or I believe understand, that we will look into whatever assets or insurance coverage Nowicki and Porth has, and if they don't have any, there may be no recovery from them. This does not authorize a one-third recovery, then, for the auto owners. I understand, and the trial court said that it basically took the place of, well, as a funding source. But that's too much of a stretch given the terms of the contract. If other funding sources had been placed in that contract, or if other insurance policies or anything to give Mrs. Kelso an indication that perhaps her insurance company would be subject to the one-third contingency, she would have had the ability, then, to negotiate that when this was sent to her. As Mr. Naughton indicated, she's a businesswoman. She reads those things. If she had seen something in there about your auto insurance or other insurance, she would have asked the question. But this one, as drafted by Mr. Boyke, doesn't pull that back in. It's just not broad enough to cover her own insurance company. One other part is that Judge Simmons did testify, testified about contracts, contingency fee contracts, and leaving them open-ended. But he also said that the practice is that you will sit down with your client. You'll go over this contract. You'll explain that perhaps we don't know every circumstance that could arise and that the contract might cover things that we haven't thought of yet. Mr. Boyke did none of that. Mr. Boyke never explained this to Sharon. Mr. Boyke faxed these to her. Mr. Boyke met Sharon once before our trial in 2016, and that was at Sharon's granddaughter's wedding, at a social occasion. Never once was there the minimum contact that Judge Simmons indicated were part of the drafting and the completion of the contingency fee agreements that he drafts. Thank you for your time. I would ask that the appeal, Mr. Boyke, not be denied, and the cross-appeal, finding that the contracts do not cover the auto owner's insurance, be granted. Thank you. Mr. Nod, Mr. Rebuttal. Thank you. The adjuster for auto owners, Monica Stewart, testified that this was the maximum recovery that could have been occasioned in this case. Okay. Hold on a minute. Look, just by way of anecdotes, I used to represent insurance companies in these things, and a trained monkey could have gotten $970,000 out of this insurance company on the facts of this case. They're going to get the checkbook out. But going back to the contract, doesn't that envision a tort claim? Are the people responsible for minor injuries? And then on the contract, between her and the insurance company, if they won't pay up the money, now you've got a contract dispute with your insurance carrier. In other words, if there wasn't enough money to cover your losses and you had an argument that they were underinsured. How can you argue that a reasonable layperson could look at this contract, or for that matter, a reasonable lawyer, look at this contract and say that the way it's worded here, assume tort claims against the people responsible and any contract dispute you might have with your insurance carrier. I've been doing this since 1986. I deal solely and exclusively with these kind of cases. Judge Simmons, the same thing. This contract covers that. It says, To prosecute a claim or cause of action against Sean Nowicki and Daniel Porth and or other persons or entities responsible for injuries sustained by William Kelso resulting in death on February 18. It's not the only thing that she did to acknowledge that this was a contract. This piece of paper that she signed, this authorization she signed in January, which was Exhibit P, it says, regarding the automobile accident between Sean Nowicki and William and Sharon Kelso on February 18, 2011. It couldn't be any more clear. She acknowledged. She knows. You're working on this case, and we agree to pay you one-third. Well, that, what she's saying there, that doesn't say that. It just says you can authorize these people to talk to her. We don't look at that in a vacuum, Your Honor. We look at that in conjunction with the engagement she had already agreed to, that Nowicki was going to represent her against any entity responsible. And he explained to her, and during the course of the trial, her insurance agent testified that he knew that Nowicki was involved in the case, that he was pursuing his insurance company, which was her insurance company, and that he had a one-third contingency fee agreement, and that that was reasonable and standard for pursuing an underinsured motorist claim. Real briefly, they, I'm going to give you a little time here, but you mentioned all the documents that he gathered up, Mr. Boykin gathered up. Yes. Well, he would need those documents to pursue a tort claim, right, to show damages? This was essentially a tort. So against the people liable in tort. Absolutely. They dovetail perfectly. That's exactly the same documentation that he would present to Nowicki's insurer as he would to the counsel insurer's. He had to get all that stuff gathered together and present it in a cohesive fashion so that he could make the case that they were entitled to compensation in the amount of the full $1 million. There's no doubt of that. And that's what he did. That's how one presents a tort claim. A UIM claim is no different from a tort claim. It's exactly the same. Monica Stewart, the adjuster for auto owners, testified that she treats them no differently. Whether it's a third-party claim or a first-party claim, an uninsured or underinsured motorist, it's the same elements of proof, the same requirements. Well, the same elements of proof to show the damage. But once they see, look, I've got a dead insured and these medical bills and all this kind of stuff and there's only a million bucks here, get the checkbook out and let's move on. It's not my experience. That's definitely not my experience. These insurance companies don't lay down. Monica Stewart testified today at a trial. So did Judge Simmons. And Judge Simmons has a lot of experience in this area as well. He's done a multitude of trials. He's done UIM and UIM arbitrations after he retired and before he went on to work for the law firm that he's working now. And he described the process that the insurance companies, and they may look to a layperson like it's a dead-bang winner, but that doesn't mean the insurance company is just going to turn over, raise their arms up and say, take whatever you want, reach in my pocket and grab whatever is in there. That's not how it works. In my experience and the judge's experience, that's not how it works. You have to assemble your proofs, present them, and make certain threats. But it also depends upon the coverage in that policy and the obvious damages. So when they look at it and say there's no way in the world we're going to be able to show that our exposure is below policy limits on this, you've got a dead guy, you've got medical bills and what have you, and you've got two and plus the injured wife. And they say, look, not in our wildest dreams can we argue that their damages are less than $1 million. They do do that. If they've got a closer, if arguably you've got a bigger policy and a question about whether it's a thing, then you get in that other situation. Isn't that the way it works? No, that's not the way it works. It really isn't. You have a company like Safeway with low-limit policies, $25,000 policy. They won't turn it over even though it's a broken leg case. They'll fight it. They'll say that on a rear-end case, the driver was going in reverse. There are a million defenses that are interposed. That was just an example. In any event, I think that Kelso made some argument that Mrs. Kelso, her contract wasn't fulfilled. Well, it's a 16-ounce bottle of Coke. You can only get 16 ounces. You can only get $1 million out of a single-limit policy. The way to maximize it was to assess all of the damages to Mr. Kelso. That way there would be no repayments of Medicare, and that's why all of the damages were assessed to Bill Kelso's case. If there are no other questions, I know I've run over. Thank you. Thank you, too. This matter will be taken under advisement.